# Exhibit C

Case 8:10-cv-00693-TBM   Document 105-3   Filed 03/09/12   Page 2 of 22 PageID 943
City of St. Petersburg, Florida v. Wells Fargo Bank, N.A.        8:10-CV-693-T-23TBM
R. Glenn Hubbard        September 1, 2011

55

1     A        No.

2     Q        Have you worked with the Reed Smith

3  law firm before, other than I believe they're also

4  involved in the SCF Arizona case?

5     A        To my recollection, no.

6     Q        Do you have an understanding of the

7  allegations in this particular lawsuit?

8     A        At the basic level, yes.

9     Q        What's your understanding of the

10  allegations?

11    A        Well, again, my understanding is

12  whether this was an appropriate investment in a

13  securities lending arrangement.  That's not the task

14  I was given, but my understanding is that's the

15  basic allegation or question for a finder of fact.

16    Q        And I think, as you know, your opinion

17  doesn't address the appropriateness of the

18  investment, correct?

19    A        Well, I would view that my opinion

20  would be a core element to making that call, but

21  I -- that is not a call that I, as an economist, am

22  making.

23    Q        Do you have any understanding as to --

24  let me back up.

25             You haven't reviewed the contract or

Case 8:10-cv-00693-TBM   Document 105-3   Filed 03/09/12   Page 3 of 22 PageID 944
City of St. Petersburg, Florida v. Wells Fargo Bank, N.A.      8:10-CV-693-T-23TBM
R. Glenn Hubbard        September 1, 2011

56

1    the securities lending agency agreement between

2    St. Petersburg and Wachovia Global Securities

3    Lending, now Wells Fargo?

4         A         No.  My understanding is that was

5    Mr. Peavy's role in this matter.  That's not

6    something that I've considered.

7         Q         And you don't know what information

8    Wachovia was supposed to provide to St. Petersburg,

9    correct?

10        A         I do not.

11        Q         And you're not expressing an opinion

12   as to the adequacy of the information provided by

13   Wachovia to St. Petersburg, correct?

14        A         No.  My opinion only relates to the

15   information that was actually publicly available

16   about Lehman.

17                  If this is a new line, can we just

18   take a quick break?

19        Q         Actually, if you hang on just one

20   second.

21        A         No, no, no.  I didn't want to

22   interrupt.  Okay.

23        Q         You said something that reminded me of

24   a question.

25                  You just said that -- you said that

57

1    you looked at publicly available information,

2    correct?

3         A        Yes.

4         Q        I was curious, you had made a

5    statement about -- I'm looking particularly on

6    page 10 of your report.

7         A        Okay.

8         Q        And you were talking about credit

9    rating agencies.  And at the top of the page, you

10   say, "The rating -- the ratings and commentary from

11   the credit rating agencies are the result of

12   in-depth analyses of publicly available and

13   nonpublic information"?

14        A        Credit rating agencies will look at a

15   variety of things, yes.

16        Q        What access do they have to nonpublic

17   information?

18        A        Well, credit rating agencies will

19   often have discussions with management that

20   outsiders might not have.  And credit rating is a

21   heuristic that summarizes a whole variety of

22   information.

23              MR. MARCUS:  If you want to take a

24       break, this would be a fine time to do that.

25              THE VIDEOGRAPHER:  We're going off the

Case 8:10-cv-00693-TBM  Document 105-3  Filed 03/09/12  Page 5 of 22 PageID 946
City of St. Petersburg, Florida v. Wells Fargo Bank, N.A.    8:10-CV-693-T-23TBM
R. Glenn Hubbard            September 1, 2011

58

```
 1        record.  The time is 10:55 a.m.  This is the
 2        end of Tape 1.
 3                 (Whereupon, a short break was taken.)
 4                 THE VIDEOGRAPHER:  We're back on the
 5        record.  The time is 11:05 a.m.  This is the
 6        start of Tape 2.
 7   BY MR. MARCUS:
 8        Q       You haven't reviewed the securities
 9   lending investment guidelines relating to
10   St. Petersburg's account, correct?
11        A       No, sir.  Yes, that's correct, I
12   should say.
13        Q       And you don't know what rating
14   criteria may have been applicable to the Lehman
15   Brothers investment at issue in this case, correct?
16        A       I'm sorry, do you mean do I know the
17   official credit rating or do I --
18        Q       No.  The rating criteria expressed in
19   the investment guidelines.
20        A       I think that would be a subsidiary of
21   your previous question, so the answer would be no.
22        Q       As you know, us lawyers like to be
23   thorough.
24        A       That's okay.
25        Q       So, I need to do that.
```

59

1               And you don't know whether corporate

2    bonds were a permissible investment or not?

3         A       I do not.

4         Q       Have you reviewed any deposition

5    testimony in this matter?

6         A       No.

7         Q       Do you know what actions Wachovia

8    Global Securities Lending was taking in 2007 and

9    2008 with respect to investments in Lehman Brothers

10   prior to the Lehman Brothers bankruptcy?

11        A       I don't, no.

12        Q       In your, I guess, macro economic view

13   of Lehman Brothers, I take it Wachovia's assessment

14   of Lehman Brothers in the summer of 2008 is

15   irrelevant to your opinion?

16               MR. COBETTO:   Objection to the form of

17          the question.

18               THE WITNESS:   Well, my opinion would

19          be more what the market, at which Wachovia is a

20          player, but an aggregation of the market or

21          things like prices, and I can observe those.

22          So, Wachovia's views are subsumed in market

23          prices, which I already have.

24   BY MR. MARCUS:

25        Q       But Wachovia-specific, wouldn't you

City of St. Petersburg, Florida v. Wells Fargo Bank, N.A.      8:10-CV-693-T-23TBM
R. Glenn Hubbard          September 1, 2011

60

1    look at a macro level of the market's view, it's not

2    for purposes of your analysis, you don't -- do you

3    think it would be helpful to know if Wachovia

4    believed a bankruptcy was -- a Lehman bankruptcy was

5    possible, for example?

6        A        Well, a bankruptcy is always possible

7    for any company at any time.

8        Q        Right.

9        A        A more interesting question is whether

10   the bankruptcy was foreseeable, and market

11   information suggests that it's not.  Had Wachovia

12   foreseen the Lehman bankruptcy, the multibillion

13   dollar profit opportunity there might have been a

14   good call.

15       Q        Well, do you know what Wachovia was

16   doing to mitigate the risks of a Lehman Brothers

17   bankruptcy in the summer of 2008?

18       A        I don't, sorry.

19       Q        Do you know that they calculated a

20   probability of default in August of 2008?

21       A        I don't know that.  You can calculate

22   probabilities of default for market prices.  I have

23   no idea what their internal calculations are.

24       Q        You can do it with credit default

25   swaps, too, right?

63

1      there were securities lending accounts that held

2      Lehman?

3          A        Yes.

4          Q        And that would be an indication that

5      at least they had certain views as to their

6      creditworthiness of Lehman, correct?

7          A        Correct.

8          Q        I didn't see anything in your report

9      discussing what various financial institutions were

10     doing to hedge against or protect themselves against

11     a potential Lehman default.

12         A        No, other than the movements in the

13     CDS prices, which would indicate market sentiment.

14         Q        Do you know what, if anything,

15     Wachovia was doing to mitigate its potential losses

16     with respect to a potential Lehman default?

17                  MR. COBETTO:  Objection to the form.

18                  THE WITNESS:  I think I've answered

19           this already, but to be clear, no.

20     BY MR. MARCUS:

21         Q        Do you have an opinion as to whether

22     the risks associated with a Lehman default were

23     increasing in the summer of 2008?

24         A        Well, I think what you can say, in the

25     summer of 2008, looking at CDS, or credit default

64

1    spreads, for financial firms generally is that there

2    was a perception of some combination of greater risk

3    or changes in liquidity in that market.

4        Q       Have you reviewed any of the

5    communications between St. Petersburg and Wachovia

6    in this matter?

7        A       No, sir, I have not.

8        Q       And am I correct you have no opinion

9    as to the appropriateness of Wachovia's risk

10   assessment of Lehman Brothers because you don't know

11   what their risk assessment was; is that correct?

12       A       That's correct.

13       Q       Have you conducted any analysis of the

14   relative risk of the Lehman Brother bonds versus

15   other comparable investments that existed in the

16   summer of 2008?

17       A       The exercise in the report that would

18   come closest to that would be a look at the CDS

19   prices.  Also, for the discussion we had earlier

20   about comparisons of firms that would ultimately go

21   bankrupt.  But the simplest comparison would be the

22   CDS prices.

23       Q       Would that indicate that, among

24   financial services entities, Lehman Brother bonds

25   were more risky than investments, credit

```
 1         A        I'm saying that it's not reasonably
 2    foreseeable.  We know that there are individual
 3    investors that did bet against Lehman.  They turned
 4    out to be right.
 5         Q        How do you define "reasonably
 6    foreseeable"?
 7         A        Given the data and information that
 8    you have, that there's a, you know, material
 9    probability of bankruptcy.  And the information you
10    would want to look at are securities prices, both in
11    primary markets and derivative markets, and
12    available information about the credit quality of
13    the firm; what other investors are doing and so on.
14         Q        What's a material probability?
15         A        To me, if you're asking about
16    reasonably foreseeable in bankruptcy, it would be
17    that -- you know, it would be a small number, a
18    small probability of bankruptcy.
19         Q        If there's a 10 percent chance of
20    bankruptcy, would that -- would that be a material
21    probability?
22         A        You know, again, there's no bright
23    line, but I would say, you know, somewhat above that
24    might be something that you would really worry
25    about.
```

City of St. Petersburg, Florida v. Wells Fargo Bank, N.A.      8:10-CV-693-T-23TBM
R. Glenn Hubbard          September 1, 2011

74

1        Q        Well, you wouldn't worry about it --

2    you, personally, would not feel that a 10 percent

3    chance of bankruptcy is material probability of

4    bankruptcy?

5        A        Well, keep in mind there is no single

6    calculation that gets you to 10, 20, 30 or anything

7    else.  You're backing it out from individual data

8    sources that often send different answers.

9                 So, it's really a qualitative

10   assessment that someone has to make, obviously

11   informed by market prices.

12       Q        And whether something is material,

13   there's a lot of subjectivity in that, correct?

14       A        Well, it would certainly be in the

15   judgment of whoever is making the claim.

16       Q        Right.  I mean, if someone said, I

17   would find it material to know if there's a

18   10 percent chance of a default, do you have -- would

19   you dispute that opinion?

20       A        I guess I would want to know why the

21   person believes that and whether that was already

22   priced in.  We know that the prices of the Lehman

23   bonds indicated a negligeable, almost zero

24   probability of default until the very end.

25       Q        Have you done that calculation?

City of St. Petersburg, Florida v. Wells Fargo Bank, N.A.      8:10-CV-693-T-23TBM
R. Glenn Hubbard          September 1, 2011

75

1      A        All we have to do is look at the bonds

2   trading near par.  It's not a difficult -- I can do

3   it for you.

4      Q        Wachovia could have done that, right?

5      A        All I'm saying is all you have to do

6   is look at the bond prices.

7      Q        I'm just asking you.  You said it's

8   a -- I understand your opinion that you said it's --

9   that it was not reasonably foreseeable; is that

10  correct?

11     A        That's my opinion, yes.

12     Q        And then you said in your opinion,

13  it's not -- when you're looking at reasonableness or

14  foreseeability, you're looking at whether there's a

15  material chance, correct?

16     A        If that's your question.  If your

17  question is an investment question, you want to know

18  whether that chance, whatever it is, is accurately

19  priced into the security.  People may buy securities

20  that have a significant chance of default, if

21  they're being paid for that risk.

22     Q        And what I guess piqued my curiosity

23  is I think I heard you say that, in your opinion,

24  the risk of default of the bonds was negligible?

25     A        Until the end, yes.

City of St. Petersburg, Florida v. Wells Fargo Bank, N.A.    8:10-CV-693-T-23TBM
R. Glenn Hubbard        September 1, 2011

                                                              76

1       Q        And how do you define negligible?

2       A        Well, the bond prices were near par

3  until close to the end.

4       Q        Well, I mean, are you saying that it

5  was a less than 1 percent chance of a Lehman Brother

6  bankruptcy?

7       A        There are multiple factors that

8  influence bond prices, but I'm saying it's very,

9  very small, until the end.

10      Q        I'm trying to get a sense of what

11  very, very small means.

12      A        Well, you have to do the calculation,

13  but you can look at the bond price and see it's so

14  near par, high 90s, it would have been negligible.

15      Q        If someone did a calculation that

16  there's a 10 percent chance of a Lehman Brothers

17  bankruptcy, is that -- is that possible, in your

18  opinion?

19               MR. COBETTO:  Objection to form.

20  BY MR. MARCUS:

21      Q        I know you haven't done that

22  calculation.

23      A        Well, I did, of course, because it's

24  in the CDS charts, and toward the end you would see

25  that.  At the very, very end, you might see

1    something, depending on your assumptions about

2    probability -- or recovery and loss, you might get

3    to 10 percent, maybe.

4         Q        Would that be in, let's say -- how do

5    you define very, very end?

6         A        I think in the days or couple of weeks

7    before.  I don't remember the CDS numbers exactly.

8    The reason I say you have to look hard is because to

9    go from a CDS price to a probability of default, you

10   have to make an assumption about recovery, too, so

11   it depends on your assumption.

12        Q        Would you agree that, let's say, on

13   September 1, it's possible someone could have

14   calculated a 10 percent chance of default for Lehman

15   Brother bonds?  That doesn't sound crazy to you?

16        A        Somebody could calculate whatever they

17   want.  If your question is what the CDS price is, I

18   don't recall that the CDS price would have delivered

19   that September 1.  But yes, you could have your own

20   subjective estimate of any level.

21        Q        Well, I'm sorry.  Someone could

22   calculate it using the CDS prices?

23        A        Well, they would have to make

24   assumptions about recovery.  But yes, you could use

25   the CDS price any day and make your guess about

City of St. Petersburg, Florida v. Wells Fargo Bank, N.A.      8:10-CV-693-T-23TBM
R. Glenn Hubbard          September 1, 2011

78

1    probability of default.

2        Q         And that's what credit analysts do,

3    right?

4        A         Well, I hope credit analysts are doing

5    more than that, but yes, that's among the things

6    they would do.

7        Q         So, you would agree -- well, do you

8    have an opinion -- have you done that calculation,

9    as to the probability of default of the Lehman

10   Brother bonds, let's say, as of September 1, 2008?

11       A         All I've done is report the CDS

12   prices, which were the markets' assessment.   I've

13   opined what the given recovery rates are typically

14   for Moody's.   So, essentially, that calculation is

15   there.

16       Q         What percentage would you ascribe to

17   the probability of a Lehman Brothers default as of

18   September 1, 2008?

19       A         I don't really recall.   When you put

20   the numbers together, my recollection is the CDS, at

21   the end, they were close to a 10 percent

22   probability.   But that's not adjusted for recovery.

23   So, somewhat less than that.

24       Q         And whether that is a material

25   probability depends on the risk assessment of the

Case 8:10-cv-00693-TBM   Document 105-3   Filed 03/09/12   Page 16 of 22   PageID 957
City of St. Petersburg, Florida v. Wells Fargo Bank, N.A.      8:10-CV-693-T-23TBM
R. Glenn Hubbard              September 1, 2011

79

1    individual investor, correct?

2         A        Yes.  And, of course, that would only

3    be one input into the decision that's actually in

4    this case, just whether you sell a security, right.

5         Q        You could look at other things?

6         A        You must, in fact.  Not you can.  You

7    must, if you're making that decision.

8         Q        And, certainly, if you're looking at

9    it at a micro level, as to a specific investor with

10   a specific investment, there's a lot of things you

11   need to look at with respect to the investor's risk

12   tolerances?

13        A        Well, I'm not quite sure I understand

14   your question.  You certainly want something that

15   matches someone's risk tolerance, if that's your

16   question.  The question is whether it does depends

17   on a contract, depends on what the alternative is,

18   if you sell.  I mean, these are complicated

19   questions.

20        Q        And do I understand what you're saying

21   is, for you, personally, a 10 percent risk in

22   default is not material?

23             MR. COBETTO:  Objection to form.

24             THE WITNESS:  That's not what I said.

25   I said that's the only part of the question you

80

```
 1              have to ask.  The question is whether something

 2              is priced and what your risk tolerance is.

 3                     You might well buy a security that has

 4              an implied default probability of 50 percent,

 5              if you think you're being more than adequately

 6              paid for that risk.  You may find some

 7              securities that look safe in their pricing but

 8              you don't believe you're being paid.

 9                     So, it's harder than you're making it

10              sound.

11    BY MR. MARCUS:

12         Q        Well, I'm not trying to oversimplify

13    it.  In fact, I want to make sure I agree with you.

14                     I think what you're saying is a

15    10 percent chance -- you can't determine whether a

16    10 percent chance of default is material or not

17    without looking at a lot of other factors, including

18    factors relating to the investor's risk tolerance?

19         A        And whether that's effectively being

20    priced.  In other words, if you're being compensated

21    for bearing risk, and you have that tolerance, fine.

22    If you don't think you're being compensated for

23    bearing risk, than that's very different.  It's not

24    so much material or not; it's whether your question

25    was meaningful.
```

81

1        Q        Now, prior to September 1, would you

2    put the -- would the data you collected suggest that

3    the risk of a Lehman Brothers default was, let's

4    say, less than whatever it was on -- I'm not trying

5    to pin you to the 10 percent number, but I'm just --

6    relatively speaking, the risk of a Lehman default

7    that would have been calculated, let's say, on

8    January 1, 2008, was less than the risk of a Lehman

9    Brothers default, let's say, on September 1, 2008?

10       A        Much less, but we don't have to guess.

11   Should we just look at the exhibits together?

12       Q        We will in a minute.  I just want

13   to --

14       A        Well, I prefer to look at it now,

15   since you're asking me a specific question.  The

16   answer is yes.

17       Q        I think you answered my question, so

18   that's all I'm asking you right now.

19       A        Okay.

20       Q        We'll get to the charts in a minute.

21   I know you're anxious.  We'll get there.  I'm just

22   trying to understand the broad picture first here.

23              In your opinion, you talk about that

24   there are scenarios that the market was aware of in

25   the summer of 2008 that could have played out with

1      Q       And I guess maybe what I'm getting at

2    is, certainly you could have a AAA rating or an

3    AA-plus or AA or AA-minus or A-plus.  There were,

4    let's say, corporate bonds that were available in

5    June of 2008 that held ratings higher than A?

6      A       Yes.  In fact, you could buy

7    Treasuries, or agencies; you just wouldn't have made

8    any money on a SEC lending program.  But yes, you

9    could buy any of those.

10     Q       Right.  And, of course, you don't

11   know what the -- you don't have any opinion or

12   knowledge as to the investment philosophy or risk

13   tolerance of St. Petersburg, correct?

14     A       I am not here to opine on that.  My

15   statement is more just you can't have a profitable

16   SEC lending program that's investing in Treasuries,

17   that's all.

18     Q       Right.  Well, you obviously agree that

19   you -- it's not uncommon for investors to remove

20   money out of a market rather than invest and forgo

21   the profit, in order to avoid risk?

22     A       Well, in this case, that investor, if

23   you mean your client, would have to have taken a

24   significant loss, but yes.

25     Q       Do you use the word "significant."

Case 8:10-cv-00693-TBM   Document 105-3   Filed 03/09/12   Page 20 of 22 PageID 961
City of St. Petersburg, Florida v. Wells Fargo Bank, N.A.        8:10-CV-693-T-23TBM
R. Glenn Hubbard          September 1, 2011

190

1    Investment Management.  What was that about?

2         A         That was also excessive fees.

3         Q         Let me guess.  Your opinion was that

4    there were not excessive fees?

5         A         Yes.  And that has also come down in

6    favor of American Sentry.

7         Q         Okay.  Other than this case, the

8    SCF Arizona case, and the Board of Trustees of

9    Southern California -- the Board of Trustees of

10   Southern California case, are there any other cases

11   in which you've done an analysis of the reasonable

12   foreseeability of a default event?

13        A         It's just been the Bank of New York

14   Mellon and Wachovia matters.

15        Q         If you turn to appendix C, it has a

16   list of materials that you considered in preparing

17   your report.

18                  I note that there are two documents in

19   this case; one is Deposition Exhibit 45 and one is

20   Deposition Exhibit 40.

21                  I assume those are documents that were

22   provided to you by counsel for Wells Fargo, correct?

23        A         Yes, sir.

24        Q         Do you know why those two exhibits

25   were provided to you?

City of St. Petersburg, Florida v. Wells Fargo Bank, N.A.      8:10-CV-693-T-23TBM
R. Glenn Hubbard          September 1, 2011

191

1       A       My recollection, and it's only that

2   because I can't remember every Bates stamped

3   document, is that they're related to data.

4       Q       And when you say you can't remember

5   every Bates stamped document, are there any others?

6       A       No, but it's just -- my memory doesn't

7   work looking at Bates stamp to translate into

8   things.

9       Q       Okay.

10      A       Sorry.

11      Q       But did you ask for something in

12  particular?

13      A       It probably came as a result of a data

14  request that I made, and these were the sources of

15  the data.  But I don't remember, looking at this,

16  what that is.

17      Q       As far as the legal filings, were

18  those something that either you or your group found

19  on your own, or are those things that were provided

20  to you by counsel?

21      A       No.  I asked for them myself.

22      Q       When you say you asked for them, did

23  you ask counsel for them or did you ask your

24  research folks to see what other cases are out

25  there?

Case 8:10-cv-00693-TBM  Document 105-3  Filed 03/09/12  Page 22 of 22 PageID 963
City of St. Petersburg, Florida v. Wells Fargo Bank, N.A.     8:10-CV-693-T-23TBM
R. Glenn Hubbard          September 1, 2011

192

1       A        I asked the Analysis Group folks.

2   Some of these may have come from counsel.  Some, I

3   had already been able to obtain on my own, like the

4   Valukas report.

5       Q        The list of other data and documents,

6   are these things that you found on your own or

7   things that your group researched and found on your

8   behalf?

9       A        Well, I asked them to bring back the

10  universe of analysts reports, which is mostly what

11  this is.  There are also some news articles that

12  related to questions.  But, generally, these are the

13  analyst reports that I asked them for.

14      Q        And in preparing your opinion, did you

15  read all these reports?

16      A        I did go through all of the analysts

17  reports.

18      Q        Did you read them all?

19      A        Well, I didn't have to read every

20  section for what I was looking for.  I was trying to

21  ascertain in the analyst reports a couple of things:

22  One, what was their overall rating, and second, any

23  mention of bankruptcy.

24              MR. MARCUS:  Why don't we take a short

25      break.  I may be very close to being finished.